# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Bradley Nichols</u>

     v.                           Case No. 16-cv-443-PB
                                          Opinion No. 2018 DNH 047
<u>US Social Security Administration,</u>
<u>Acting Commissioner</u>


### <u>MEMORANDUM AND ORDER</u>

Bradley Nichols challenges the denial of his claims for Social Security disability income ("SSDI") benefits pursuant to 42 U.S.C. § 405(g). He contends that the Administrative Law Judge ("ALJ") erred in formulating his residual functional capacity ("RFC") by failing to adequately consider his mental impairments and by improperly weighing the opinion of his treating psychologist. The Acting Commissioner, in turn, moves for an order affirming the ALJ's decision. For the reasons that follow, I deny Nichols's motion and affirm the Commissioner's decision.

### I.   <u>BACKGROUND</u>

Nichols is a 43 year-old man with a high school education. Doc. No. 14 at 2. He has previously worked as a tow truck operator, an auto mechanic, a bench inspector, a machinist, and a construction worker. See Administrative Transcript ("Tr.")

46-47, 65.  He alleges that he has been disabled since December 28, 2011, due to a combination of physical and mental impairments, including chronic leg pain, Hepatitis C, major depressive disorder, post-traumatic stress disorder ("PTSD"), and opiate dependence in remission.  See Tr. 19, 22-23.[1]

## A. Procedural History

Nichols's first filed for SSDI benefits in January 2012, alleging a date last insured of December 31, 2012.  Doc. No. 14 at 1.  His claim progressed to a hearing before an ALJ, Ruth Kleinfeld, who issued a fully favorable decision on November 5, 2013, finding that Nichols had been disabled since his alleged onset date.  Tr. 121, 123.  On August 22, 2014, however, the SSA Appeals Council vacated ALJ Kleinfeld's decision on its own motion, finding two errors of law that, in its view, required remand for further administrative development.  See Tr. 123-24.  Because ALJ Kleinfeld ("the first ALJ") had retired by the time of the Appeals Council's order, Nichols's case was remanded to a different ALJ, Thomas Merrill.  See Tr. 123-24, 341.

A second hearing was held on September 30, 2015 before ALJ Merrill ("the second ALJ").  On December 22, 2015, the second

---

[1] In accordance with Local Rule 9.1, the parties have submitted a joint statement of stipulated facts, (Doc. No. 14). See LR 9.1. Because that joint statement is part of the court's record, I only briefly recount the facts here.  I discuss further facts relevant to the disposition of this matter as necessary below.

ALJ issued his written decision, concluding that Nichols was not disabled at any time from December 11, 2011, the alleged onset date, through December 31, 2012, his date last insured.  Tr. 34. On August 2, 2016, the Appeals Council denied Nichols's request to review the second ALJ's decision, see Tr. 1, thus making that decision the final decision of the Acting Commissioner.  Nichols now appeals.

**B.    First ALJ's Decision & Appeals Council's Remand**

Following a hearing held in August 2013, the first ALJ determined that Nichols's had been disabled from December 28, 2011, through November 5, 2013, the date of her decision.  Tr. 114, 120.  She reached that conclusion after applying the five-step, sequential analysis required under 20 C.F.R. § 404.1520. At step one the first ALJ determined that Nichols had not engaged in substantial gainful activity since December 28, 2011, the alleged onset date.  At step two, she determined that Nichols suffered from "the following severe impairments: chronic leg pain; gastroesophageal reflux disease ("GERD"); sleep apnea; hepatitis; depression with anxiety; [PTSD]; and opiate dependence in remission."  Tr. 116.  At step three, she found that Nichols's impairments did not equate to any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 that would render him disabled per se.  Id.

At step four, the first ALJ determined that Nichols had the mental RFC to perform "light work," with restriction "to brief, unskilled, uncomplicated tasks; and brief and superficial interaction with co-workers, supervisors, and the public." Tr. 116-17. She further determined that Nichols's ability to concentrate, persist, and sustain pace was limited "to two-hour blocks throughout the day." Tr. 117. In making that finding she considered Nichols's full medical record up until the date of the decision as well as his subjective complaints and testimony as to the severity of his mental conditions, which she found "generally credible." Tr. 119. At step five, she determined that the demands of Nichols's past relevant work exceeded his RFC, and ultimately concluded that there were no jobs in significant numbers in the national economy that Nichols could perform.

In reaching this step-five conclusion, the first ALJ exclusively relied upon the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App. 2 (the "Grid"), rather than any vocational expert testimony. See Tr. 120. She noted that in light of Nichols's age ("younger individual"), education ("high school graduate"), work experience ("semiskilled - skills not transferable"), and RFC, a finding of "not disabled" would ordinarily be directed by Medical-Vocational Rule 202.21. Tr. 120. In considering the added effect of Nichols's nonexertional

limitations, however, the first ALJ ultimately concluded that "a finding of 'disabled' [was] appropriate under the framework of [the] rule." Tr. 120. Finally, the first ALJ determined that Nichols's substance use disorder was not a contributing factor material to the finding of disability, briefly explaining that as of July 2013 "he was doing well," "was stable," and was involved with group meetings three times per week. See Tr. 121.

Nine months later, in August 2014, the Appeals Counsel vacated the first ALJ's decision on its own motion. Tr. 123-125. In a written order, the Appeals Council explained its decision to remand was based upon two errors. First, the Appeals Council found that the first ALJ had erred at step-five by failing to obtain vocational expert evidence that Nichols's could not perform other work despite his functional limitations. Tr. 123-24. Second, it found that the first ALJ had also erred by failing to properly conduct the additional analysis required when a claimant has a history of drug addiction or alcoholism ("DAA Evaluation Process"), which takes place following step-five. See Tr. 124; see also 20 C.F.R. § 404.1535; Social Security Ruling 13-2P, 2013 WL 1221979 (S.S.A. Mar. 22, 2013). Although the first ALJ determined that Nichols's substance use was not a contributing factor material to her disability finding, the Appeals Council found that her decision lacked the specific analysis required to support that conclusion. Tr. 124.

Due to those two errors of law, the Appeals Council concluded that the first ALJ's decision was not supported by substantial evidence, despite its preliminary finding that her step-four RFC assessment for the period through December 31, 2012 was substantially supported by the record. Tr. 123.

As a result, the Appeals Council vacated the first ALJ's decision and remanded Nichols's claim to a second ALJ for a new hearing. Tr. 125. Among other instructions upon remand, the order directed the second ALJ to "[g]ive further consideration to [Nichols's] maximum [RFC]," and "[o]btain evidence from a vocational expert to clarify the effect of the assessed limitations on [Nichols's] occupational base." Tr. 124. The order also instructed that "[i]f [Nichols] is found disabled," the second ALJ must "conduct the further proceedings required to determine whether substance abuse is a contributing factor[] material to the determination of disability." Tr. 125.

## II. THE SECOND ALJ'S DECISION

Following remand and a second hearing in August 2015, the second ALJ issued a written decision on December 22, 2015, concluding that Nichols had not been disabled at any time during the pertinent period from December 28, 2011 through December 31,

2012.[2]  See Tr. 34.  His conclusion followed from his own

application of the five-step, sequential analysis to Nichols's

claim.  At steps one through three, the second ALJ found that

Nichols (i) had not engaged in substantial gainful activity

since December 11, 2011; (ii) had severe impairments of "status

post ankle fracture, Hepatitis C, major depressive disorder and

[PTSD]"; and (iii) did not have an impairment that met or

medically equaled the severity of one of the listed impairments

in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 22-23.

In reaching the step-three conclusion with regards to

Nichols's mental impairments, the second ALJ thoroughly

considered the so called "paragraph B" criteria.[3]  Specifically,

the ALJ found that Nichols's mental impairments resulted in (i)

_____

[2] Pursuant to the SSA's Hearings, Appeals, and Litigation Law
Manual ("HALLEX"), see HALLEX I-2-6-58A, the second ALJ's review
upon remand was limited to the consideration of "evidence dated
within 12-months of the alleged onset date," as those records
are the only records "material to show that the allegedly
disabling conditions [had] existed" for 12 months, as required
by applicable regulations.  Tr. 20.  Discussion of evidence
prior to that period was limited to providing context and
determining credibility issues.  Tr. 20.  Nichols's does not
appear to challenge the basis of that conclusion.

[3] "To satisfy the 'paragraph B' criteria, the mental impairments
must result in at least two of the following: marked restriction
of activities of daily living; marked difficulties in
maintaining social functioning; marked difficulties in
maintaining concentration, persistence, or pace; or repeated
episodes of decompensation, each of extended duration."  Tr. 24.
"A marked limitation means more than moderate but less than
extreme."  Id.

mild restrictions in activities of daily living, (ii) moderate difficulties in social functioning, and (iii) moderate difficulties in maintaining concentration, persistence, or pace. Tr. 24-25. He further found that Nichols had not experienced any episodes of decompensation for an extended duration. Tr. 25. In making those decisions, the second ALJ gave substantial weight to the opinion of state consultative psychologist, Michael Schneider, Psy.D., who had reviewed Nichols's existing record during the pertinent period and concluded that he had the mild and moderate limitations discussed above. Tr. 25; see Tr. 101.

At step four, the second ALJ determined that Nichols had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b), with certain limitations. Tr. 26. Regarding physical limitations, the second ALJ found that Nichols could only perform postural activities on an occasional basis, although he could balance frequently, and that he had unlimited use of his hands and feet to operate foot controls, push, and pull.[4] See Tr. 26. Regarding mental limitations, the second ALJ determined that Nichols was able "to understand, remember, and carry out [one-to-three] step instructions without special supervision," and was able to complete a normal eight hour

_____

[4] Nichols does not challenge the second ALJ's decision with respect to his physical impairments.

8

workday and 40 hour work week. Tr. 26. He also found that Nichols could "interact appropriately with coworkers and supervisors, with occasional contact with the general [public]; and [could] respond[] to change in the work setting" under those circumstances. Tr. 26, 66. In making his finding, the second ALJ considered a variety of medical sources, but gave "great weight" to the opinion of Dr. Schneider, which will be further discussed herein. Tr. 32. In light of this RFC and vocational expert testimony, the second ALJ concluded that Nichols was unable to perform any past relevant work. Tr. 33.

Finally, at step five, the ALJ ultimately determined that Nichols was "not disabled" during the period under review. Tr. 33-34. In support of that conclusion, the second ALJ found that in light of his age, education, work experience, and RFC during the pertinent period, Nichols would have been capable of performing certain light-exertional jobs that existed in significant numbers in the national economy. See Tr. 33-34. He based this conclusion on the testimony of a vocational expert, who opined at Nichols's second hearing that a hypothetical person with Nichols's age, education, work experience, and RFC could perform the representative occupations of assembler, merchandise marker, and housekeeper. Tr. 34, 65-67. Accordingly, the ALJ found that Nichols was "not disabled"

during the period from December 11, 2011 through December 28, 2012.  Tr. 34.

### III.   STANDARD OF REVIEW

I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  See 42 U.S.C. § 405(g).  That review is limited, however, "to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  I defer to the ALJ's findings of fact, so long as those findings are supported by substantial evidence.  Id. Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the ALJ's factual findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion."  Id. at 770.  If, however, the ALJ derived her findings by "ignoring evidence, misapplying the law, or judging matters entrusted to experts,"

10

her findings are not conclusive.  Nguyen v. Chater, 172 F.3d 31,
35 (1st Cir. 1999) (per curiam).  The ALJ is responsible for
determining issues of credibility, drawing inferences from
evidence in the record, and resolving conflicts in the evidence.
See Irlanda Ortiz, 955 F.2d at 769.


# IV.  ANALYSIS

     Nichols contends that the second ALJ's decision was not
supported by substantial evidence based on several grounds.
Doc. No. 8-1 at 2.  First, he argues that the second ALJ's
mental RFC was flawed in that "it was not based on the record as
a whole and [did] not consider the effect" of Nichols's "mental
impairments."  Id. at 3.  He principally faults the second ALJ
for inadequately explaining his divergence from the first ALJ's
mental RFC determination.  Id.  Second, he argues that the
second ALJ erred in failing to adequately explain the weight
given to certain medical sources in formulating Nichols's RFC.
Id. at 10.  He specifically faults the second ALJ's treatment of
the opinion evidence of Melissa Perrino, M.A., Nichols's
treating mental-health clinician; Marianne Marsh, M.D., one of
Nichols's treating psychologists; and the evidence of Nichols's
prior award of disability benefits by the state of New
Hampshire.  Id. at 6-10.  Third, Nichols argues that the second
ALJ erred in relying on a vocational expert's testimony because

the hypothetical posed to the expert at step-five was not based upon substantial evidence.  Id. at 12; Doc. No. 11-1 at 22. Finally, Nichols argues that the second ALJ erred by failing to comply with the Appeals Council's order directing him to conduct the analysis necessary for determining whether Nichols substance abuse was a contributing factor "material to the determination of disability."  Doc. No. 8-1 at 13.

In response, the Acting Commissioner contends that the second ALJ's decision is supported by substantial evidence and should be affirmed.  Doc. No. 11-1 at 24.  She argues that the second ALJ's mental RFC determination was based on substantial evidence, and that he appropriately considered the expert opinions identified by Nichols.  Id. at 4-7.  She further argues that because the second ALJ did not find Nichols disabled, he was not required to conduct the analysis pertaining to material contribution of Nichols substance abuse.  Id. at 24.  I address, and reject each of Nichols's arguments in turn.

A.  **Failure to Adequately Consider Mental Impairments**

Nichols first claims that the ALJ erred in formulating his RFC by failing to adequately consider the limiting effects of his mental health impairments.  He advances two subsidiary arguments to support that contention.  First, he argues that the second ALJ's mental RFC finding was substantially less restrictive than the first ALJ's RFC determination.  He argues

that because the Appeals Council found that the first ALJ's RFC finding was substantially supported by the record, the second ALJ's failure to explain the basis for his divergence from the first ALJ's decision constituted reversible error. Doc. No. 8-1 at 3. Second, citing specific portions of his medical record, Nichols argues that his mental impairments impose "far greater limitations" than those reflected in the second ALJ's RFC, and that the second ALJ's RFC is therefore not supported by substantial evidence. Id. at 6. Neither argument is persuasive.

1. Difference in Subsequent RFC Determination Upon Remand

First, Nichols faults the second ALJ for formulating a "less restrict[ive]" mental RFC than that formulated by the first ALJ and failing to explain "why" his mental RFC finding deviated from the first ALJ's, which the Appeals Council found substantially supported by the record. Id. at 3-5. This argument is flawed for a number of reasons. To start, even assuming that the two mental RFC's meaningfully differ,[5] there is

---

[5] Although the two RFC's are worded differently, they do not appear to meaningfully differ in the functional capacity they envision. The first ALJ determined that Nichols had the mental RFC to perform "light work," with restriction "to brief, unskilled, uncomplicated tasks; and brief and superficial interaction with co-workers, supervisors, and the public," with an additional limitation on concentration, persistence, and pace "to two-hour blocks throughout the day." Tr. 116-17. By comparison, the second ALJ determined that Nichols had the mental RFC to perform "light work," with the ability to

no general requirement that an ALJ tasked with deciding a remanded claim is in any way bound by the findings or conclusions of a prior ALJ whose decision has since been vacated. See Gibbs v. Barnhart, 130 Fed. Appx. 426, 430 (11th Cir. 2005); Nolan v. Colvin, No. 4:15-cv-935, 2016 WL 1719671, *4 (N.D. Ala. Apr. 24, 2016); see also Miller v. Barnhart, 175 Fed. Appx. 952, 955-56 (10th Cir. 2006) (upon remand from Appeals Council, second ALJ not precluded from finding no significant impairment at step-two where first ALJ found there was a significant impairment). On the contrary, when an initial ALJ's decision is vacated and remanded by the Appeals Council, as here, the ALJ is typically directed to issue a "a new decision" after offering the claimant "a new hearing." See HALLEX I-2-8-18(A), 1993 WL 643058 (S.S.A. May 26, 2017); Tr. 125. Unless otherwise ordered by the Appeals Council, this necessarily includes a new RFC finding. Although an ALJ in receipt of a remand order is required to take whatever action the Appeals Council orders therein, he is also free to "take any additional action [that is] not inconsistent with [that] order." Gibbs, 130 Fed. Appx. at 430 (quoting 20 C.F.R. § 410.665(b));

---

"understand, remember, and carry out [one-to-three] step instructions without special supervision"; to "complete a normal [eight] hour work day and a 40 hour work week"; to "interact appropriately with coworkers and supervisors, with occasional contact with the general [public]"; and to respond to change in the work setting. Tr. 26.

see 20 C.F.R. § 404.977(b). "Indeed, the ALJ is encouraged to review the record on remand, and check initial findings of fact and make corrections, if appropriate." Nolan, 2016 WL 1719671, at *4 (internal quotes and cites omitted). Thus, as long as his decision is supported by substantial evidence, an ALJ's failure to explain why or how his RFC finding deviates from that of a since vacated, prior decision does not constitute a viable basis for reversal. See Hamlin v. Barnhart, 365 F.3d 1208, 1223-24 (10th Cir. 2004) (ALJ re-examining a record upon remand may "certainly" revise a claimant's RFC category, so long as revised decision is supported by substantial evidence); see also Howard v. Berryhill, 17-cv-276, 2017 WL 5507961, *3-4 (D. Colo. Nov. 17, 2017) (noncompliance with Appeals Council's order alone not a basis for reversal); Sanders v. Astrue, No. 11-cv-1735, 2013 WL 1282330, *11 (E.D. Mo. Feb. 8, 2013) (accord).

Here, the second ALJ acted within the purview of the Appeals Council's remand order. Among other instructions, the remand order explicitly directed the second ALJ to "[g]ive further consideration to [Nichols's] maximum [RFC]" and to obtain further psychiatric expert evidence "if necessary . . . to clarify the onset, nature, severity, and limiting effects of [Nichols's] mental impairments." Tr. 124. Thus, the remand order clearly contemplated a reassessment of Nichols's RFC by the second ALJ. It said nothing to preclude the second ALJ from

revisiting Nichols's mental RFC anew without reference to the first ALJ's determination.  Moreover, and consistent with the HALLEX, the order explicitly directed the second ALJ to issue a "new decision" after offering the claimant "a new hearing."  Tr. 125; see HALLEX I-2-8-18(A), 1993 WL 643058 (S.S.A. May 26, 2017).  Thus, because the second ALJ's mental RFC is supported by substantial evidence, for the reasons that follow, his failure to "explain why" his own RFC determination differed from that of the first ALJ does not constitute an error, let alone a reversible one.

### 2.  Substantial Evidence Supports Second ALJ's RFC

Next, Nichols claims the ALJ erred because "the record as a whole" shows that he had "far greater limitations in the mental demands of work" than the second ALJ's mental RFC finding imposed.  Doc. No. 8-1 at 6.  As discussed, the second ALJ determined that Nichols was able to perform "light work" and "to understand, remember, and carry out [one-to-three] step instructions without special supervision," to complete a normal eight hour workday and 40 hour work week, to "interact appropriately with coworkers and supervisors, with occasional contact with the general [public]," and to "respond[] to change in the work setting."  Tr. 26, 66.  Nichols argues that this RFC does not fully account for the limitations imposed by his depression and PTSD.  But other than reiterating his own

subjective allegations and citing selected portions of the
medical record, Nichols offers nothing to support that
contention.  Because I find that the second ALJ's RFC finding is
supported by substantial evidence, I reject Nichols's argument
and find no error.

A claimant's RFC is "the most [the claimant] can still do
despite [his] limitations."  20 C.F.R. § 416.945(a)(1).  It is
the ALJ's responsibility to formulate a claimant's RFC at step
four, although typically, that finding must be supported by an
expert opinion "assess[ing] the extent of functional loss."
Roberts v. Barnhart, 67 Fed. Appx. 621, 622–23 (1st Cir. 2003);
Blackette v. Colvin, 52 F.Supp.3d 101, 113 (D. Mass. 2014).   As
part of an RFC determination, an ALJ must "identify the
[claimant's] functional limitations or restrictions and assess
his or her work-related abilities on a function-by-function
basis . . ."  Social Sec. Ruling 96-8p, 1996 WL 374184, at *1
(S.S.A. July 2, 1996); Beaune v. Colvin, 2015 DNH 136, *2-*4.
That determination must be based on all relevant evidence in the
medical record.  20 C.F.R. § 416.945(a)(1); Lord v. Apfel, 114
F.Supp.2d 3, 13 (D.N.H. 2000).

For individuals with mental impairments, the function-by-
function assessment must include their "abilities to:
understand, carry out, and remember instructions; use judgment
in making work-related decisions; respond appropriately to

supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p, 1996 WL 374184, at *6. The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." Id. at *7. Furthermore, determining issues of credibility and drawing inferences from the record are exclusively the role of the ALJ; thus, an ALJ's findings will be upheld so long as they are supported by substantial evidence. See Blakley v. Comm. of Social Sec., 581 F.3d 399, 406 (6th Cir. 2009); Irlanda Ortiz, 955 F.2d at 769.

Here, the second ALJ's mental RFC determination is supported by substantial evidence. First, the second ALJ adequately conducted the function-by-function analysis discussed above. He considered all relevant medical evidence during the pertinent period and included citations to the record, including treatment notes from mental-health clinicians and treating psychologists, mental status examinations, and Nichols's own subjective complaints and reported daily activities. See Tr. 26-32. As noted by the second ALJ, Nichols's treatment notes over the twelve months in question reflected fluctuations in mood, symptom severity, and symptom manageability. Tr. 30-32. Although many of those reports consistently noted depressed and anxious moods and functionally impactful symptoms, treating

sources commonly reported "fair" and "normal" mental status reports, see Tr. 28, 30-32, 646; normal concentration, attention, and focus, see, e.g., Tr. 25, 106, 451, 552; and consistently found that Nichols was fully oriented and possessed average intelligence. See Tr. 30-32. Moreover, during the 12 month period at issue, the second ALJ found that Nichols's records from West Central Behavioral Health ("WCBH"), where he received the lion's share of his mental-health treatment, consistently reported global assessment functioning ("GAF") scores of 55-60, which have "historically [been] consistent with moderate symptomatology."[6] Tr. 25, 448, 451, 547. The second ALJ also repeatedly discussed Nichols's ability to care for his three young children and "function[] as a stay-at-home father," see Tr. 32, as evidenced by the record and Nichols's own testimony. Tr. 25, 30-32.

The second ALJ's RFC determination is also fully supported by the opinion of the state reviewing psychologist Dr.

[6] The GAF Scale is used by doctors to assess an individual's level of psychological, social, and occupational functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed., text rev. 2000) ("DSM IV"). GAF scores in the range of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV 32; Snay v. Colvin, 2014 DNH 134, *1 n.1. Although the persuasive value of these scores is debatable, they are still regularly used and informative.

Schneider, which the ALJ gave "great weight" and essentially adopted verbatim. See Tr. 32, 106. On March 30, 2012, Dr. Schneider, a non-examining psychological DDS consultant, provided a mental RFC assessment after reviewing Nichols's medical record. Tr. 104-06. He opined that Nichols experienced moderate limitations in a number of functional areas due to symptoms of PTSD and depression. Id. Specifically, he found that Nichols was moderately limited in his abilities to understand, remember, and carry out detailed instructions; to interact with the general public; and "to accept instructions and respond appropriately to criticism from supervisors." Tr. 105-06. He also found Nichols moderately limited in some adaptive abilities, such as "respond[ing] appropriately to changes in the work setting" and "set[ting] realistic goals or mak[ing] plans independently of others." Tr. 106. With all other abilities, including his abilities to "carry out very short and simple instructions" and "sustain an ordinary routine without special supervision" he found Nichols to be "not significantly limited." See Tr. 105. Finally, Dr. Schneider's mental RFC assessment provided that:

> "[Nichols] remains able to understand, remember and carry out short and simple instructions without special supervision. He is able to maintain adequate attention for these kinds of instructions and complete a normal 8 hour work day and 40 hour work week. He is able to interact appropriately with peers and supervisors in an environment where he does not have to interact

> frequently with the general public and where the
> supervisory criticism is not overly critical of his
> performance.  Under those circumstances, he is able to
> accommodate to changes in a work[]setting.

Tr. 106.  The second ALJ determined that the record supported

this conclusion, including Nichols's "reported level of

activity, his lack of presentation of restriction in social

functioning observed by [his treating psychologist], and his

consistent presentation of normal concentration, attention and

focus."  Tr. 25.  Thus, such evidence is surely adequate for a

reasonable mind to conclude that Nichols's retains the ability

"to understand, remember, and carry out [one-to-three] step

instructions without special supervision," to "complete a normal

[eight] hour workday and 40 hour work week," to "interact

appropriately with coworkers and supervisors, with occasional

contact with the general [public]," and to "respond[] to change

in the work setting."  Tr. 26.  As further discussed in what

follows, Dr. Schneider's opinion is supported by substantial

evidence.

Although Nichols disagrees with the second ALJ's assessment

of the medical evidence, he cannot point to any material portion

of the record that the ALJ failed to consider.  See Lord, 114 F.

Supp. 2d at 14 ("For a reviewing court to be satisfied that an

ALJ's decision was supported by substantial evidence, that

decision 'must take into account whatever in the record fairly

detracts from its weight.'" (quoting Diaz v. Sec'y of Health & Hum. Servs., 791 F. Supp. 905, 912 (D.N.H. 2000))).  Indeed, the record evidence he now cites as supporting a more restrictive RFC was all explicitly considered by the second ALJ, but much of it was attributed limited persuasive value.  Specifically, Nichols cites his own subjective complaints, selective treatment notes and mental status examinations from February 2012 through October 2012, and the mental RFC opinion of his treating mental-health clinician, Melissa Perrino, M.A.  Tr. 472-521.

During his function-by-function analysis at step four, the ALJ thoroughly discussed all of these materials.  See, e.g., Tr. 30 (discussing GAF score of 33 and evaluation in July 2011 that rendered Nichols eligible for state-supported mental health services).  He ultimately concluded, however, that the record as a whole failed to demonstrate limitations so severe that would preclude Nichols from performing light work with the provided functional limitations.  See Tr. 27-33.  For example, while the ALJ recognized that status reports from August 2012 indicated a slight worsening in Nichols's condition, due in part to turmoil between he and his wife and "medication mismanagement," the second ALJ concluded that nothing showed "that this worsening persisted [or] would require additional work-related restrictions."  Tr. 31-32.  This was a perfectly reasonable inference given the lack of objective medical evidence

indicating otherwise.  See Gregoire v. Colvin, 2015 DNH 035, *3
(lack of objective evidence suggests reliance on "subjective
complaints," which is grounds for "reject[ing] the opinion of a
treating physician.").

Moreover, the persuasive value of much of the evidence
Nichols now points to fell victim to the second ALJ's adverse
credibility assessment of Nichols's own subjective allegations.
Tr. 27.  Indeed, the second ALJ found that Nichols's own
"statements concerning the intensity, persistence and limiting
effects of [his] symptoms [were] not entirely credible," due,
inter alia, to his referenced daily activities, lack of candor
regarding his medical and legal histories, and repeated
instances of drug seeking behavior.  Tr. 27, 30-32.  He further
found that Nichols's allegations of an "extremely limited range
of functional abilities" were not entirely supported by or
consistent with the objective medical evidence.  Tr. 27.
Similarly, the ALJ gave "little weight" to the mental RFC
opinion of Ms. Perrino and Dr. Marsh, as further discussed
below, finding that those opinions were largely based on
Nichols's own subjective complaints and were generally
inconsistent with the higher level of functioning reflected in
their own treatment notes, as well as those of other attending
psychologists.  See Tr. 28.  All of these conclusions were well
within the purview of the ALJ's step-four responsibilities.  See

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  Nichols's argument that the record supports a more restrictive RFC, as allegedly evidenced by the more restrictive mental RFC of the first ALJ, does nothing to undermine the ALJ's conclusions.  See Blakley, 581 F.3d at 405-06 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)); American Textile Mfrs. Institute, Inc. v. Donovan, 452 U.S. 490, 523 (1981) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (citing Consolo v. FMC, 383 U.S. 607, 620 (1981)).

## B.  **Weight Given to Opinion Evidence**

Nichols next argues that the second ALJ erred by failing to adequately articulate the weight he attributed to certain medical opinion statements of record pertaining to his mental impairments.  Doc. No. 8-1 at 10-12.  Specifically, he takes issue with the second ALJ's treatment of (i) an August 2012 mental RFC opinion signed by Nichols's mental health clinician, Ms. Perrino, and his treating psychologist, Dr. Marianne Marsh, see Tr. 28, 32, 104-106; (ii) the mental RFC opinion of Dr. Schneider, Doc. No. 8-1 at 10; and (iii) an award of Aid to the

Permanently and Totally Disabled ("APTD") benefits by the state of New Hampshire, see Tr. 28, 32, 769-91. Because I conclude that the second ALJ adequately explained the weight he assigned each respective opinion, I find no reversible error.[7]

---

[7] To the extent Nichols advances this second claim of error under the same theory he advanced his first, I find it unpersuasive for the reasons previously discussed. In this context, Nichols argues that the two ALJs reviewed the same opinion evidence herein discussed, but reached divergent conclusions as to the appropriate weight each deserved. Specifically, Nichols notes that whereas the first ALJ gave substantial weight to the opinion of Ms. Perrino and Dr. Marsh and little weight to the opinion of Dr. Schneider, the second ALJ gave great weight to the opinion of Dr. Schneider and little to that of Ms. Perrino and Dr. Marsh and the award of APTD benefits. Because the Appeals Council found that the record substantially supported the first ALJ's RFC, Nichols argues, the second ALJ's RFC finding is tainted by reversible error to the extent that he weighed the same opinions differently than the first ALJ. This argument likewise presents a fundamental misunderstanding of the substantial evidence standard. Upon remand, the second ALJ was directed to render a "new decision," which necessarily required him to independently consider the relevant medical opinions. See HALLEX I-2-8-18(A), 1993 WL 643058; Tr. 125; see also Nolan, 2016 WL 1719671, at *4 ("Indeed, the ALJ is encouraged to review the record on remand, check initial findings of fact and make corrections, if appropriate." (internal quotations and citations omitted)). He was in no way bound by the RFC determination of the first ALJ, and was not precluded from attributing different weight to the opinions than the first ALJ, to the extent his conclusions were based on substantial evidence. The substantial evidence standard plainly allows for the same evidence to be construed differently to support varying conclusions. See Blakley, 581 F.3d at 405-06; American Textile Mfrs. Institute, Inc. v. Donovan, 452 U.S. at 523 ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."). Thus, the second ALJ's reweighing of the pertinent medical opinions did not constitute reversible error.

1.  Opinions of Ms. Perrino and Dr. Marsh

Nichols first claims that the second ALJ committed error by giving "little weight" to the mental RFC opinions of his "treating providers," which consisted of (i) a check-box form signed by both Ms. Perrino and Dr. Marsh, and (ii) a subsequent letter from Ms. Perrino.  Doc. No. 8-1 at 10.

A "treating source's" opinion is entitled to "controlling weight" if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence."  20 C.F.R. § 404.1527(c)(2); see Foley v. Astrue, No. 09-10864, 2010 WL 2507773, *8 (D. Mass. June 17, 2010).  Even if a treating source's opinion does not satisfy these requirements, it may be "entitled to deference," see SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996)), "insofar as it is 'well-supported.'" Hudon v. Colvin, 2016 DNH 019, at *2 (quoting 20 C.F.R. § 404.1527(c)(2)).  To determine how much weight a treating source's opinion should receive, the ALJ must consider the "length of the treatment relationship," the "nature and extent of the treatment relationship," the opinion's supportability and consistency with the record as a whole, the treating source's area of specialization, if any, and any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c).  If the ALJ discounts a treating source's opinion, the ALJ must give "good reasons" for

doing so.  Jenness v. Colvin, 2015 DNH 167, *6; see SSR 96-2p, 1996 WL 374188, at *5.  "Good reasons" are those "supported by the evidence in the case record, and . . . sufficiently specific to make clear . . . the weight [the ALJ] gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2p, 1996 WL 374188, at *5; Allard v. Colvin, 2014 DNH 034, *5; see also Jenness, 2015 DNH 167, *6 ("To meet the 'good reasons' requirement, the ALJ's reasons must be both specific and supportable." (internal citations and punctuation omitted)).  Although opinions from so-called "other medical sources," such as those that are not acceptable, are not entitled to the same deference as treating sources, an ALJ should generally explain the weight given such opinions or otherwise ensure that the discussion of evidence in the decision makes his reasoning apparent.  See SSR 06-03P, 2006 WL 2329939, at *3, *6; see also Allard, 2014 DNH 034, *4.

Melissa Perrino, M.A., was a licensed mental health clinician with West Central Behavioral Health (WCBH) during the pertinent period, who had regularly provided mental-health counseling to Nichols since he began services with WCBH in July 2011 through the date last insured.  See Doc. No. 14 at 13-14; Tr. 767.  Dr. Marianne Marsh is a psychiatrist, also with WCBH, who performed several psychiatric assessments on Nichols and had been involved with his psychiatric care since July 2011.  Doc.

No. 14 at 11; Tr. 573, 595.  On August 22, 2012, Ms. Perrino and Dr. Marsh both completed and signed a mental RFC assessment of Nichols based upon his treatment at WCBH ("August 2012 RFC"). Tr. 28, 589-94.  The opinion consists of a preprinted form that contains a list of twenty mental activities organized under four cognitive categories.  See Tr. 589-94.  Ms. Perrino and Dr. Marsh rated the degree to which Nichols's mental impairments limited his functional abilities with respect to each activity by circling one of five options under each one, e.g. "markedly limited," "moderately limited," or "not significantly limited." Id.  They opined that Nichols was "moderately limited" in his abilities to understand, remember, and carry out detailed instructions, and "make simple work-related decisions."  Tr. 589-91.  They further opined that he was "markedly limited" with regards to thirteen other activities relating to "sustained concentration and persistence," "social interaction," and "adaptation," including his abilities to "sustain an ordinary routine without special supervision," to "interact appropriately with the general public," and to "respond appropriately to changes in the work setting."  Tr. 589-92.[8]  Moreover, the

---

[8] Under Social Security regulations, "marked limitation" means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listings) § 12.00(F)(2)(d).  The August 2012 Mental RFC opinion provided no citation to federal or state law, nor did it provide

several "comments" sections throughout form, where Ms. Perrino
and Dr. Marsh were encouraged to leave "[d]etailed
explanation[s] of the degree of limitation for each category,"
were all left blank.  See Tr. 589-94.  Furthermore, in July
2013, Ms. Perrino provided an update to her opinion, stating
that due to recent improvements, she believed Nichols was only
moderately limited, rather than markedly limited, in his ability
to "perform activities within a schedule," "maintain
attendance," and to "be aware of normal hazards and take
appropriate precautions."  Tr. 767.  She noted that all other
evaluations appeared up-to-date.  Id.

In his mental RFC discussion, the ALJ recited the function-
by-function breakdown contained in the August 2012 RFC, as well
as the two improvements noted in Ms. Perrino's letter.  Tr. 28.
He assigned "little weight" to both opinions, explaining that
"they are not well supported by or consistent with the evidence
of record through the date last insured."  Id.  With regards to
the August 2012 RFC, the ALJ found that "[t]he circled items . .
. do not constitute opinion regarding the requisite B criteria."
Id.  He further noted that the treatment notes of Ms. Perrino,
Dr. Marsh, and other treating sources did "not reflect such a

---

a definition of "marked" as used therein, but there is no reason
to conclude that it meaningfully deviated from the above
definition.

limited level of functioning." Id. He then went on to discuss the content of those treatment notes and other mental status examinations later in his decision. Tr. 30-32. The ALJ further found the opinions expressed in Ms. Perrino's 2013 letter to be unpersuasive, noting that she "is not an acceptable medical source," "[h]er treatment notes reflect a higher level of functioning than set out in her opinion statements," and her opinion was inconsistent with other objective medical evidence. Tr. 28, 32.

The ALJ's decision attributing "little weight" to the August 2012 RFC was both "supported by the evidence in the case record" and "sufficiently specific." See SSR 96-2p, 1996 WL 374188, at *5. The ALJ supportably described the August 2012 RFC and July 2013 letter and provided sufficiently specific reasons for discounting them, specifically his conclusions that they were internally inconsistent and in conflict with the other medical evidence, as well as with the opinion of Dr. Schneider.[9] See Camille v. Colvin, 652 Fed. Appx. 25, 27 (2d Cir. 2016).

_____

[9] The ALJ's conclusion that Ms. Perrino was not an "acceptable medical source" is correct, as she is a licensed mental-health clinician. See 20 C.F.R. § 404.1502(a) ("clinician" not included among "acceptable medical sources"); SSR 06-03P, 2006 WL 2329939, at *2 ("licensed clinical social workers" and "therapists" are not "acceptable medical sources"); see also Mainwaring v. Berryhill, No. 16-cv-82, 2017 WL 915128, at *5 (D. Or. Mar. 7, 2017) (mental-health clinician "not acceptable medical source"). Thus, the ALJ was not required to provide "good reasons" for discounting her July 2013 letter opinion.

First, although it would have been preferable for the ALJ
to explain his reasoning with greater clarity, his explanation
that "[t]he circled items . . . do not constitute opinion
regarding the requisite B criteria" is reasonably construed as a
reference to the lack of detail contained in the "multiple
choice style" form.  Tr. 28.  In assigning weight to an opinion,
an ALJ may permissibly consider an opinion's depth of analysis
and supporting evidentiary sources, or lack thereof.  See 20
C.F.R. §§ 404.1527(c), 416.927(c) ("The more a medical source
presents relevant evidence to support a medical opinion,
particularly medical signs and laboratory findings . . . [and]
[t]he better an explanation a source provides for a medical
opinion, the more weight we will give that medical opinion.");
Douglas v. U.S. Social Sec. Admin., 2016 DNH 176, *7.  Thus,
courts have routinely found that an ALJ may permissibly reject

_____

The August 2012 RFC, however, as noted by the second ALJ, was
cosigned by Dr. Marsh, who also treated Nichols and worked with
Ms. Perrino at WCBH.  Thus, that opinion is subject to the
"treating physician" rule and could only have been discounted if
supported by "good reasons."  See King v. Colvin, 128 F. Supp.
3d 421, 436 n.14 (D. Mass. 2015) ("Where a treating acceptable
medical source co-signs a non-acceptable medical treating
source's opinion, the resulting opinion constitutes that of both
sources.").  Ms. Perrino's letter, by contrast, is an opinion
solely from a non-acceptable medical source, and the second ALJ
therefore need have only "generally . . . explain[ed]" the
weight attributed to it and made his reasoning apparent. See SSR
06-03P, 2006 WL 2329939, at *3, *6; see also Allard, 2014 DNH
034, *4.  For the reasons discussed, I conclude that the second
ALJ adequately explained the weight given to both the August
2012 RFC and the July 2013 letter.

an opinion where it only consists of a "check-off report" or "word-circle" questionnaire without providing any narrative explanation or citation to substantiate its conclusions.  See Wringer v. Colvin, No. CV-15-02554, 2016 WL 4035737, at *3 (D. Ariz. July 28, 2016); Petero v. Colvin, No. 16-cv-11389, 2017 WL 3923983, at *7 (E.D. Mich. Aug. 14, 2017); see also Revels v. Berryhill, 874 F.3d 648, 671 (9th Cir. 2017) ("[W]hen evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." (citing Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005))); Mason v. Shalala, 994 F.2d 1058, 1065-66 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best . . . where these so-called reports are unaccompanied by thorough written reports, their reliability is suspect." (internal citations omitted)). Although the August 2012 RFC form invited Ms. Perrino and Dr. Marsh to provide more "detailed explanation[s] of the degree of limitation for each category" assessed, they declined to provide any such explanation to support their conclusions.  Tr. 589-94. Instead, the "multiple-choice style" report merely indicates that the opinions expressed were based on "diagnosis and treatment" of Nichols, and review of his records from July 12, 2011 to August 22, 2012.  Tr. 594.  Without any meaningful

analysis or citation to objective medical evidence to support the "marked limitations" expressed therein, the ALJ was well-warranted in attributing "little weight" to the opinion. See Petero, 2017 WL 3923983, at *7; Douglas, 2016 DNH 176, *7 ("[A]n ALJ may permissibly conclude that an opinion lacking functional analysis is of limited utility in determining a claimant's RFC.").

Second, the ALJ's explanation that the August 2012 RFC was not well supported by or consistent with the record as a whole is also a "good reason" to reject it, as he adequately supported that conclusion. Douglas, 2016 DNH 176, *7; see 20 C.F.R. §§ 404.1527(c)(4) & 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give [it]."). As the ALJ explained, an overview of Nichols's objective clinical presentation "[did] not describe [him] as limited in functioning as [he was] described in the [August 2012 RFC]." Tr. 32. Indeed, psychologists from both WCBH and Dartmouth-Hitchcock Medical Center ("DHMC"), where Nichols received suboxone treatment for his opioid addiction beginning in May 2012, repeatedly reported findings more consistent with the moderate limitations reflected in Dr. Schneider's RFC. See Tr. 30-32; King, 128 F. Supp. 3d at 436 (D. Mass. 2015) ("If the treating-source opinion conflicts with other opinions in the record, however, the ALJ is entitled to

resolve those conflicts and may reject the opinion of the treating physician so long as an explanation is provided and the contrary finding is supported by substantial evidence." (internal citations and quotations omitted)). For example, in their mental status examinations, attending psychologists regularly reported Nichols's good, normal, or only "moderately impaired judgment," see Tr. 30, 449, 548, 551-52, 575, 646; his "cooperative" or "pleasant" attitude, see Tr. 30, 548, 575, 650, 691; his "linear," "appropriate," or "logical" thought process, see Tr. 31, 552, 570, 575; and that he was managing his symptoms appropriately. See Doc. No. 14 at 16, 19, 20, 27; Tr. 545, 547-48, 575, 719-20; see also Doc. No. 14 at 23 (doctor reporting on August 30, 2012, that Nichols's "mood, affect, behavior, judgment, and thought content were all normal.").

Moreover, as the second ALJ noted, the record indicated that, notwithstanding his mental impairments, Nichols was able to care for his young children during the day, cook and clean on occasion, do laundry, and attend his medical appointments. Tr. 25, 30, 306; Doc. No. 14 at 2. Thus, the ALJ's conclusion that the "marked" limitations in basic areas of functioning found by Ms. Perrino and Dr. Marsh were inconsistent with the record as a whole is supported by substantial evidence. See King, 128 F. Supp. 3d at 436. His overview of the objective medical evidence and appropriate citation to the record is sufficiently

specific to constitute a "good reason" for attributing "little weight" to the August 2012 RFC.  See Walter v. Colvin, 2016 DNH 030, *8–*9 (finding no error where ALJ discounted treating physician's opinion because of, *inter alia*, inconsistency between the opinion and "medical records show[ing] cooperative behavior with good grooming and pleasant behavior."); Hammock v. Colvin, No. 3-14-0853, 2015 WL 4490870, *10 (M.D. Tenn. July 22, 2015) (ALJ sufficiently articulated inconsistencies between medical opinion and record as a whole).

Third, the ALJ's finding that the August 2012 RFC was also inconsistent with the treatment notes of Ms. Perrino and Dr. Marsh also qualifies as a "good reason" supported by substantial evidence.  See Davidson v. Astrue, 501 F.3d 987, 990–91 (8th Cir. 2007) (discounting treating physician's opinion where treatment notes over the course of two years contained few hints at the serious physical limitations contained in opinion supporting disability claim); Douglas, 2016 DNH 176, *8. Nichols presented to Ms. Perrino at least fourteen times during the pertinent period for mental-health counseling, see Doc. No. 14 at 14-25, and the ALJ discussed some of Ms. Perrino's treatment notes in his decision, which illustrated the alleged inconsistencies between those notes and the August 2012 and July 2013 opinions.  See Tr. 30-32.  For example, although Ms. Perrino opined in the August 2012 RFC that Nichols was "markedly

limited" in areas such as "ask[ing] simple questions or request[ing] assistance," and "accept[ing] instructions and respond[ing] appropriately to criticism," see Tr. 589-94, treatment notes reveal that in March 2012 she encouraged Nichols to "develop his thoughts and feeling[s] about pursuing his goal of going back to school." Tr. 532. She further noted that Nichols was "conflicted with want[ing] to get his SSI [benefits], yet also wanting some educational structure in his day." Tr. 532. Moreover, the second ALJ's conclusion that Ms. Perrino's treatment notes reflected a "higher level of functioning" than that expressed in her opinions is supported by substantial evidence, as her notes do not make reference to functional limitations as extreme as those contained in the August 2012 RFC. Furthermore, as noted by the second ALJ, Dr. Marsh's treatment notes contain similar inconsistencies. For example, in her August 2012 assessment of Nichols, Dr. Marsh noted that he had not demonstrated any antisocial traits during the past two years in treatment and that it did "not appear to be an active issue." Tr. 575; see Tr. 31. Despite that finding, the August 2012 RFC finds Nichols as markedly limited in "interacting appropriately with the public." Tr. 591.

Finally, the second ALJ's conclusions calling Nichols's credibility into doubt further undermine the opinions of Ms. Perrino and Dr. Marsh. As discussed, the second ALJ found that

Nichols's own "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible," Tr. 27, due, inter alia, to his referenced daily activities, lack of candor regarding his medical and legal histories, and repeated instances of drug seeking behavior. Tr. 30-32. Such evidence can provide "good reasons" for rejecting a treating physician's opinion. See Douglas, 2016 DNH 176, *9 ("An adequately supported claim of exaggeration can constitute or complement a 'good reason' for rejecting a treating source's opinion.").

### 2. Dr. Schneider's Opinion

Relatedly, Nichols challenges the second ALJ's decision to give "great weight" to the opinion of the state consultative psychologist, Dr. Scheider, whose opinion was previously discussed. He argues that "the weighing of [a] non-treating consultant's [opinion] must meet stricter standards than that of treating physicians." Doc. No. 8-1 at 11. Although that statement is generally accurate, see SSR 96-2p, 1996 WL 3774188, at *2 (S.S.A. July 2, 1996), nothing precludes an ALJ from giving greater weight to the opinion of a non-treating physician than that of a treating source where the former is supported by substantial evidence. See Tetreault v. Astrue, 865 F. Supp. 2d 116, 124 (D. Mass. 2012); Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he regulations . . . permit the opinions of

nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record.").

Here, the second ALJ did not err in attributing "great weight to Dr. Schneider's opinion after concluding that opinion was most consistent with the medical record as a whole. Dr. Schneider's opinion that Nichols's moderate impairments in, *inter alia*, his ability to understand, remember, and carry out detailed instructions and to interact with the general public left him with the functional capacity to perform light work as limited in the second ALJ's mental RFC was supported by substantial evidence. See Tr. 25, 32 (referencing Tr. 105-06.). Specifically, it is supported by the treatment notes and mental status assessments of WCBH and DHMC treating sources, evidence of Nichols's daily activities, and the second ALJ's credibility assessment of Nichols, as previously discussed. See Camille, 652 Fed. Appx. at 28. Furthermore, as noted by the second ALJ, Dr. Schneider is a specialist and state consultant and "expert[] in the evaluation of the medical issues in disability claims under the [Social Security] Act," see SSR 96-6p, 1996 WL 374180, at *2, and his "check-box opinions were supplemented by [a] narrative explanation." Camille, 652 Fed. Appx. at 28 (citing 20 C.F.R. § 404.1527(c)(3)-(6)).

Thus, for the reasons discussed, I find the ALJ's decisions to give "little weight" to the opinions of Ms. Perrino and Dr.

Marsh and "great weight" to Dr. Schneider's opinion were "supported by evidence in the case record" and "sufficiently specific" to constitute "good reasons." SSR 96-2p, 1996 WL 374188, at *5.

### 3.   The APTD Eligibility Determination

Next, Nichols challenges the second ALJ's articulation of his decision to give Nichols's prior "receipt of APTD benefits" little weight.  Tr. 28; Doc. No. 8-1 at 10-12.  Because I find the second ALJ's explanation of that decision to be adequate for many of the reasons already discussed, I find no error.

Although relevant disability determinations by other agencies "must be considered" by the ALJ, they are not binding. SSR 06-03P, 2006 WL 2329939, at *6-7; see Alvarez v. Sec'y of Health & Human Servs., 62 F.3d 1411 (Table), 1995 WL 454717, at *1 n.1 (1st Cir. 1995).  "The amount of weight to be attached to another government agency's disability determination is left to the [ALJ] to determine." Gathright v.Shalala, 872 F. Supp. 893, 899 (D. N.M. 1993).  Such determinations should be weighed under the same factors and federal regulations previously discussed, see SSR 06-03P, 2006 WL 2329939, at *6-7 (citing 20 C.F.R. §§ 404.1527, 416.927), considering "all of the supporting evidence underlying the [other agencies] decision" that is part of the record before the ALJ.  20 C.F.R. § 404.1504.

On February 1, 2013, the New Hampshire Administrative
Appeals Unit ("NHAAU") determined that Nichols was "medically
eligible to receive benefits" under the state's APTD program.
Doc. No. 14 at 29-30 (citing Tr. 783). The NHAAU's decision was
based on its conclusion that, under applicable New Hampshire
law, Nichols's "moderate impairments in activities of daily
living, social functioning and concentration, persistence or
pace [were] expected to prevent [substantial gainful activity]
for 48 months." Tr. 783. In support of that conclusion, the
NHAAU had elicited testimony from a vocational consultant. Tr.
782. The consultant had opined that given the mental RFC
assigned to Nichols by the NHAAU, which included moderate
interactions with the general public, "there would not be
sufficient jobs available for [Nichols] to perform at the
sedentary level." Tr. 782. The NHAAU therefore determined that
a finding of "disabled" was warranted. Tr. 782.

    The second ALJ appropriately considered the NHAAU's APTD
evaluation, but ultimately concluded that the decision was
entitled to "little weight," based predominantly on two reasons.
Tr. 28. First, he found that the decision largely relied upon
the opinions of Ms. Perrino and Dr. Marsh. Id. He reasoned
that because he found those opinions unpersuasive, for the
reasons previously discussed, he similarly found that the APTD
evaluation should be entitled to the same limited weight

assigned to those opinions.  Id.  Second, he found that the
"supporting records before the state decision maker(s) [were]
not the complete record before [him]."  Id.  Specifically, he
referenced the testimony of a vocational consultant that
appeared before the NHAAU, who had opined that given the
Nichols's RFC as determined in that case, "there would be no
jobs for someone with only moderate limitation in dealing with
the general public."  Id.  He noted that that opinion was not
part of the record before him and was not consistent with the
testimony of the vocational expert that testified before the
second ALJ.  See id.  Finally, he noted that under federal
regulations, a "moderate" mental impairment is defined as "more
than [a] slight impairment but still able to function
satisfactorily."  Id.  He concluded that a moderate limitation
in "dealing with the public, does not affect more than
marginally the ability to perform unskilled work or simple
routine work."  Tr. 29.

    The record supports those conclusions.  Because I find that
the second ALJ adequately explained the different standards and
processes involved with the award of disabilities by different
agencies, and sufficiently explained his rationale in assigning
"little weight" to the NHAAU's APTD evaluation, I conclude that
his decision is supported by substantial evidence.

## C.  __VE Hypothetical & Materiality of Substance Abuse__

Nichols's third argument is that the second ALJ erred in relying upon the vocational expert's testimony ("VE") at step five because it was based on a "defective hypothetical" that did not adequately account for Nichols's mental impairments.  Doc. No. 8-1 at 12.  He also appears to argue that the second ALJ ignored the portion of the VE's testimony that considered the "marked limitations" identified by Ms. Perrino and Dr. Marsh.  I reject both arguments.

An ALJ can rely on the opinion of a VE to determine whether a claimant is disabled only if the VE's opinion is based on a hypothetical question that "accurately portray[s] [the] claimant's physical and mental impairments."  Ealy v. Comm'r of Social Sec., 594 F.3d 504, 516 (6th Cir. 2010); see Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994); Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982) ("[I]n order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to the conclusions that are supported by the outputs from the medical authorities.").  Thus, if the premises underlying the hypothetical are supported by substantial evidence, so too is the ALJ's reliance on the VE's answer.  See Mendez v. Sec'y of Health & Human Servs., 48 F.3d 1211 (Table),

1995 WL 94925, at *2 (1st Cir. 1995); Perez v. Sec'y of Health & Human Servs., 958 F.2d 445, 447 (1st Cir. 1991).

Here, the second ALJ posed two hypotheticals to the VE. Both inquired into the availability of any jobs for a hypothetical person with the same age, education, work history, and physical RFC as Nichols. Tr. 64-66. They only differed with respect to the non-exertional limitations contemplated in the two hypothetical persons' mental RFCs. The first hypothetical person possessed the same mental RFC as that found by the second ALJ at step four,[10] whereas the second hypothetical "add[ed]" all of the "marked limitations" found with respect to the specific activities identified by Ms. Perrino and Dr. Marsh in the August 2012 RFC. Tr. 64-66. In response to the first hypothetical, the VE opined that such a person could perform a number of light-exertional jobs available in both the local and national economies, such as product assembler, merchandise marker, and housekeeper. Tr. 66. In response to the second hypothetical, the VE opined that the added marked limitations,

---

[10] The first hypothetical reflected the second ALJ's mental RFC verbatim. Specifically, the second ALJ described a person with: "the ability to understand remember, and carry out one-to-three step instructions without special supervision . . . [who] could maintain an adequate attention for these instructions, and complete a normal eight hour workday, and 40 hour [work] week . . . [who] can interact appropriately with co-workers and supervisors, but is limited to only occasional contact with the general public, [a]nd . . . can accommodate changes in the work setting under these circumstances." Tr. 66.

in combination, "would [make it] difficult to maintain competitive employment, particularly the completing [of] a normal workday on a continuous basis."  Tr. 67.

At step-five, the second ALJ relied upon the VE's response to the first hypothetical question, and did not discuss the VE's response to the second.  Tr. 34.  The second ALJ's first hypothetical was a verbatim recital of his mental RFC determination at step four.  Tr. 66.  Because I find that RFC determination supported by substantial evidence, for the reasons previously discussed, the second ALJ's reliance on the VE's answer to the first hypothetical was appropriate.  See Perez, 958 F.2d at 447; Rodriguez v. Sec'y of Health & Human Servs., 923 F.2d 840 (Table), 1990 WL 254084, at *1-2 (1st Cir. 1990) (reliance on VE's response to one hypothetical in lieu of response to a second more limiting hypothetical was supported by substantial evidence where record permitted ALJ to conclude the allegations underlying the second hypothetical were not credible).  Furthermore, because the second ALJ rejected the medical evidence supporting the second hypothetical, he was not required to discuss the VE's response in his opinion.  See Schmidt v. Astrue, 496 F.3d 833, 845-46 (7th Cir. 2007) ("[T]he ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.");
Chrisman v. Astrue, 487 F. Supp. 2d 992, 1002 (N.D. Ill. 2007)

(VE testimony only relevant if ALJ concludes claimant has the limitations considered by the VE).  Thus, because the second ALJ's conclusions at step five are supported by substantial evidence, I find no error.

**D.   Materiality of Substance Abuse**

Finally, Nichols claims reversible error in the second ALJ's failure to comply with the Appeals Council's order with respect to determining whether Nichols's substance abuse was a contributing factor material to the determination of disability. Doc. No. 8-1 at 13.  This argument is a nonstarter.  First, substantial evidence supports the second ALJ's decision that Nichols was not disabled for the reasons discussed, so any failure to comply with the Appeals Council's order would be harmless.  See, e.g., Salcedo v. Colvin, No. EDCV 14-1668, 2015 WL 5545052, at *5 (N.D. Cal. 2015); Quimby v. Comm'r of Social Sec., No. 09-cv-20, 2010 WL 2425904, at *8 (D. Vt. Apr. 13, 2010); see also  Torres Montero v. Sec'y of Health & Human Servs., 959 F.2d 230 (Table) (1st Cir. 1992) (per curiam) ("[C]laimant's complaints about the ALJ's alleged failure to comply with the Appeals Council's remand order are particularly unpersuasive in light of the fact that the Appeals Council denied the claimant's request for review of the new decision.").

Second, the second ALJ complied with the order.  By the terms of the order itself, any obligation to conduct such

analysis was predicated upon a determination of disability.  Tr. 125 ("If the claimant is found disabled, conduct the further proceedings required to determine whether substance abuse is a contributing factor[] . . ."). Therefore, the second ALJ's determination that Nichols was "not disabled" obviated the need to conduct the substance abuse analysis.

## V.   CONCLUSION

For the reasons set forth above, I grant the Acting Commissioner's motion to affirm (Doc. No. 11), and I deny Nichols's motion to reverse and remand (Doc. No. 8).  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

March 13, 2018

cc:  Bennett B. Mortell, Esq.
      Robert J. Rabuck, Esq.